## SHELL OIL CO. v. CY MILLER, Inc.
### No. 6473.

Circuit Court of Appeals, Ninth Circuit.
Oct. 13, 1931.

Ivan L. Hyland, Ford Q. Elvidge, and Mary H. Alvord, all of Seattle (Hyland, Elvidge & Alvord, of Seattle, Wash., of counsel), for appellant.

Alpheus Byers and Alfred J. Westberg, both of Seattle, Wash., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and WEBSTER, District Judge.

SAWTELLE, Circuit Judge.

The controlling question in this appeal is whether or not the payments made to the appellant by the appellee were voluntary and with full knowledge of the facts. If no fraud, duress, or mistake of fact is shown, the amount of such payments cannot be recovered, and consideration of the other issues raised becomes unnecessary.

Appellee operated a gasoline service station in Seattle. On May 28, 1928, it entered into an agreement with the appellant whereby the appellee leased to the appellant the service station and facilities, and also agreed to buy certain products of the appellant. The lease contained the following provisions, among other things:

"4. The price of gasoline purchased by the lessor as hereinabove provided, shall be (4c) four cents less than the Shell Company of California's full market price in Seattle, Washington, which full market price is understood to be no cents higher than Shell Company of California's posted full market price at its bulk depot at Seattle, Washington.

"5. The lessor will not at any time during the term hereof exhibit or display on said premises or in close proximity thereto, any sign fixing and/or offering gasoline for sale at a price less than Shell Company of California's full market price as described above."

The rental to be paid the appellee by the appellant was to be $100 per month. From the time of the execution of the contract until August, 1928, the appellee was allowed 4 cents from the prevailing market price of gasoline in Seattle, which credit was allowed to the appellee at the time of the delivery of each order of gasoline. The rental of $100 was paid by check or by credit memorandum allowed to the appellee some time after the first of each month. At about that time the appellant commenced to allow the appellee, pursuant to an oral agreement later confirmed in writing, 2 cents a gallon on gasoline purchased during the month, as lease rent, instead of the $100. The method of making this allowance was by giving the appellee a credit memorandum, or, occasionally, a check for $100 and an additional credit memorandum for a sum sufficient to make up the two cents a gallon, including the $100. These credits were allowed once a month. Later, the appellee was allowed an additional cent, making his total "commission" 7 cents.

During this period, the appellant operated retail service stations in Seattle and vicinity, and the prevailing retail-price of Shell gasoline in Seattle and the Shell Company of California's full market price which was used as a basis for the price charged the appellee were identical.

Some time in March, 1929, the appellant commenced disposing of its distributing stations; the process being completed in May, 1929. During that period, according to the

appellee, the appellant's posted price, used as a basis for charges to the appellee, no longer corresponded to the actual market price of the appellant's gasoline in Seattle, but was consistently 3 cents higher. The practice of the appellant in thus raising its posted price above the actual market price of its gasoline thus, according to the appellee, deprived the latter of 3 cents a gallon of the commission to which it was entitled under the contract and which had been allowed to it during the summer and fall of 1928.

During this latter period, according to the appellee, the only place at which gasoline was sold at the appellant's posted price was at the appellant's bulk depot in Seattle, where from 150 to 200 gallons were sold per month. The prevailing price of appellant's gasoline, according to the appellee, was consistently 3 cents lower than the posted price, which never appeared on the invoices delivered to the appellee. It is claimed that the appellant "instructed" the appellee at what prices the latter should sell the gasoline.

At the close of the testimony, the court denied the defendant's motion for a directed verdict, and granted the plaintiff's motion for a directed verdict for $2,016.33. Judgment was rendered accordingly, and from that judgment the defendant appealed.

The foregoing statement of facts represents the appellee's view of the evidence, and, for the purpose of this opinion, it may be taken as undisputed, except as otherwise indicated by quotation.

The appellee stoutly denies that the dealings between the parties constituted an account stated. Its own pleadings and brief, however, would indicate that a balance, if any, was struck at the end of each month, at the latest.

The closing paragraph of plaintiff-appellee's reply in the court below alleges "that as a matter of fact no gasoline was delivered to the plaintiff by the defendant at any time unless cash was paid at the same time it was delivered into the tanks of the plaintiff."

In its opening brief, the appellee asserts that the method of dealing between the parties "shows that appellee was charged in some instances the full market price of gasoline at the time of delivery, and that the credit upon the said purchase *was not allowed until the end of the month.*" (Italics our own.) A fair implication from this statement is, as we have said, that a balance was struck between the parties at the end of the month, at the latest.

Be that as it may, it is not necessary to rest this decision upon the theory of accounts stated. For several months, during the period when the alleged overcharge of 3 cents a gallon was being made, the plaintiff-appellee was voluntarily paying the amounts of the invoices, less the credits allowed, without a word of question, complaint, or protest, so far as the record shows. At this present stage of the proceedings, however, the appellee does assert that, had it refused to pay the price demanded, no gasoline would have been sold to it, its lease would have been forfeited, and the Miller Company's capital investment in its plant would have been gone before it had any opportunity to recover. In support of these dire predictions, the appellee cites certain provisions in the lease, relative to cancellation of the bailment of the pumps and the appellant's right to re-enter the premises upon twenty-four hours' notice if any of the covenants should be breached.

But there is not a scintilla of evidence that any such threats were made by the appellant. Nor did the appellee, so far as the record shows, once inquire about or question any of the charges appearing on the invoices. Such inquiries or complaints, at least, might have been made by the appellee with safety, without bringing down upon its head the possible tragic consequences depicted in its brief.

Yet for months the appellee said nothing, but paid its bills. Finally, the conviction seemed to have dawned that there was an unwarranted difference between the "full market price" and the "posted full market price" —and this suit was brought for "credits" that should have been given but were not, according to appellee's theory.

We cannot agree with the appellee's attempted distinction between "payments" sought to be recovered and "credits upon purchases" which were not allowed. The distinction seems to be without a difference. The plaintiff-appellee is seeking the refund of sums paid by it—that is, "payments"—which sums should have been deducted from its invoices, but were not.

By the overwhelming weight of authority, recovery cannot be had under such circumstances.

The Supreme Court of Washington has declared its adherence to the general principle of law that we have just stated. In White v. Little Co., 118 Wash. 582, 592, 204 P. 186, 190, the court said: "Under these authorities had appellant paid the sums alleged in his fourth and seventh causes of action in excess of the sums agreed upon to be paid for the

76

trucks, and under the threats, undue advantages, and oppression alleged, on the part of the vendor, under protest at the time, we should say he would be entitled to recover such excess sums so exacted; but, so far as the pleadings show, there was no complaint or protest made at the time, and writings only were executed for the future payments for the trucks in installments. The most that could be said would be that, under such circumstances, had the payments been made under protest and involuntarily and under restraint and duress, he would have been entitled to the reformation of the agreements. He has not alleged facts sufficient to so entitle him in this action as to these causes of action."

The three Washington cases cited in the appellee's brief are not in point, since all of them involve the principle of "business compulsion," not applicable here. Moreover, in Jacobson v. Nicholas, 155 Wash. 234, 283 P. 684, the plaintiff was denied recovery, because no such "compulsion" was shown.

And no such compulsion was established in the instant case. Admitting that the "emergency" might have existed when the first alleged overcharge was attempted, such an "emergency" could not have continued over a period of months. There was nothing to prevent the plaintiff-appellee's paying the first "excessive" invoice and then, actively and alertly, threshing out the controversy then and there as to future prices.

But it did nothing, and said nothing; and it cannot now be heard to complain. The Miller company was well aware of market conditions in Seattle, and had ready access to the Shell Company's "posted price." Had the discrepancy complained of existed, a little diligence would have speedily unearthed it.

Numerous federal causes sustain this view. In Radich v. Hutchins, 95 U. S. 210, 213, 24 L. Ed. 409, Mr. Justice Field said: "To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person and property of another, from which the latter has no other means of immediate relief than by making the payment. As stated by the Court of Appeals of Maryland, the doctrine established by the authorities is, that 'a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid.' Mayor and City Council of Baltimore v. Lefferman, 4 Gill (Md.) 425 [45 Am. Dec. 145]; Brumagim v. Tillinghast, 18 Cal. 265 [79 Am. Dec. 176]; Mays v. Cincinnati, 1 Ohio St. 268."

See, also, Lamborn v. County Commissioners, 97 U. S. 181, 185, 24 L. Ed. 926; Railroad Company v. Commissioners, 98 U. S. 541, 543, 544, 25 L. Ed. 196; Little v. Bowers, 134 U. S. 547, 554, 10 S. Ct. 620, 33 L. Ed. 1016; Chesebrough v. United States, 192 U. S. 253, 259–260, 24 S. Ct. 262, 48 L. Ed. 432; United States v. New York & Cuba Mail S. S. Co., 200 U. S. 488, 494, 26 S. Ct. 327, 50 L. Ed. 569.

Judge Gilbert, of this court, lucidly expounded the principle involved in Lipman, Wolfe & Co. v. Phoenix Assurance Co., Ltd., 258 F. 544, 546: "One cannot recover money voluntarily paid with a full knowledge of all the facts, although no obligation to pay existed, but money may be recovered where paid under circumstances of fraud, misrepresentation, and threats amounting to a duress which prevents the free exercise of the will, or where it is paid on a wrongful demand, to save the party paying from some great or irreparable mischief or damage from which he could not otherwise be saved, and while money paid under apprehension, or induced by threats of suits or actions, is not in general paid under such duress as to make the payment compulsory, such threats may, in connection with other circumstances, such as the inexperience of the person threatened, or the peril to which his business is exposed, if the threats are carried out, constitute such duress that money paid under the influence thereof may be recovered as for money had and received. Carew v. Rutherford, 106 Mass. 1, 8 Am. Rep. 287; Lehigh Coal & Nav. Co. v. Brown, 100 Pa. 338; Guetzkow Bros. Co. v. Breese, 96 Wis. 591, 72 N. W. 45, 65 Am. St. Rep. 83; Vyne v. Glenn, 41 Mich. 112, 1 N. W. 997; Baldwin v. Hutchison, 8 Ind. App. 454, 35 N. E. 711; Brown v. Worthington, 162 Mo. App. 508, 142 S. W. 1082; Rees v. Schmits, 164 Ill. App. 251; Sartwell v. Horton, 28 Vt. 370; Parmentier v. Pater, 13 Or. 121, 9 P. 59."

The learned senior judge's copious citation of state authorities renders it unnecessary for us to do more than to advert to a number of federal decisions, in some of which the facts are extremely apposite to those at bar.

In L. Lazarus Liquor Co. v. Julius Kessler & Co. (C. C. A. 6) 269 F. 520, 524–525,

the significance of repeated payments, each made without protest, was stressed, and the applicability to the instant case being obvious: "Kessler & Co. could not by any strong-arm methods credit that payment to any other purpose than as directed by plaintiff in its letter of October 15th; but when the defendant refused to do this, and forwarded its draft with bill of lading attached for the balance of the purchase price, including the additional tax, and also forwarded an invoice showing that this tax had been charged as a part of the purchase price, it then became the duty of the Lazarus Company, if it desired or intended to repudiate defendant's terms, to reject this invoice and demand the return of the money that it had evidently paid in good faith, relying upon the terms of its contract with the defendant. This it did not do, *but it continued from time to time to send further orders, and make further advance payments, and pay drafts with bill of lading attached, and receive further invoices including this additional tax, without any protest of any kind or character whatever. The plaintiff, therefore, cannot recover upon the theory that payment by it of the money demanded by Kessler & Co. was compulsory and made under protest.* Flower v. Lance, 59 N. Y. 603; Regan v. Baldwin, 126 Mass. 485, 30 Am. Rep. 689; Aultman & Taylor Co. v. Mead, 109 Ky. 583, 60 S. W. 294; Railroad Co. v. Commissioners, 98 U. S. 541, 25 L. Ed. 196." (Italics our own.)

In Swift & Co. v. Columbia' Ry., Gas & Electric Co. (C. C. A. 4) 17 F.(2d) 46, 50, 51 A. L. R. 983, a case involving, as here, an alleged overcharge for which payment was voluntarily made, Judge Parker said: "But, even if the rate fixed by the contract be deemed a continuing rate, fixed under the statute, because notice thereof was filed with the commission, defendant cannot recover, for it has paid the rates charged by plaintiff, and there is evidence to support the trial judge's conclusion that it paid them voluntarily. Knudsen-Ferguson Fruit Co. v. Chicago, St. P., M. & O. R. Co. (C. C. A. 7th) 149 F. 973, certiorari denied 204 U. S. 671, 27 S. Ct. 786, 51 L. Ed. 672; Hardaway v. Southern Ry. Co., 90 S. C. 475, 73 S. E. 1020, Ann. Cas. 1913D, 266. See note to 18 L. R. A. (N. S.) 124."

See, also, Detroit Edison Co. v. Wyatt Coal Co. (C. C. A. 4) 293 F. 489, 493–494, a well-considered case, in which the authorities are exhaustively reviewed; Synthetic Patents Co. v. Sutherland (C. C. A. 2) 22 F.(2d) 494, 495–496; Heckman & Co., Inc. v. I. S.

Dawes & Son Co., Inc., 56 App. D. C. 213, 12 F.(2d) 154, 155.

As we have seen, in the instant case, the payments were voluntarily made over a considerable period of time. The plaintiff-appellee knew, or should have known, all the facts necessary for its protection. It was subjected to no duress, nor was it the victim of any fraud.

Judgment reversed.