## O'CONNOR–BILLS, Inc., et al. v. WASHBURN CROSBY CO.

### No. 2869.

District Court, W. D. Missouri, W. D.

Aug. 31, 1937.

Harding, Murphy & Tucker, of Kansas City, Mo., Hart, Porter &. McDonald, of Wichita, Kan., and Claycombe & Stump, of Indianapolis, Ind., for plaintiffs.

A. Z. Patterson and D. C. Chastain, of Patterson, Chastain, Graves & Smith, both of Kansas City, Mo., for defendant.

REEVES, District Judge.

This is a class suit in equity for an accounting, to decree a trust in certain funds, and for a declaratory judgment or decree.

The action has its origin in the Agricultural Adjustment Act approved May 12, 1933, 48 Stat. 31 (7 U.S.C.A. § 601 et seq.), and under Regulation No. 81 thereunder promulgated and made effective July 12, 1933. This act and the regulation provided for a specified tax upon domestic processors. The tax imposed was 30 cents per bushel of wheat of 60 pounds, computed and fixed at $1.38 per barrel of flour. The defendant was at the time engaged in the milling business and as a domestic processor became subject to the tax. It was required to make a return at the end of each calendar month upon blanks supplied by the government covering the commodity processed during the preceding month, With the return thus to be filed within thirty days, the computed tax was required to be paid by the processor. It was permissible for the processor to pass said tax on to its customers or vendees. During the year 1935 the defendant entered into contracts with the plaintiffs as its customers for the purchase and sale of its commodity. Such contracts made mention of the processing tax as follows:

"Taxes. .The prices named in this contract include the processing tax as now imposed by the United States on the processing of the commodities used in the manufacture of the products covered by this contract * * * pursuant to the Agricultural Adjustment Act now in effect, but do not include any increase in such tax which may become effective after the date of this contract, or any tax hereafter imposed on the sale or distribution of the products covered by this contract or the commodities used in the manufacture thereof, or any similar tax, charge, or imposition hereafter levied or imposed by or pursuant to any state legislation; and if any increase in the processing tax as now imposed shall become effective, or any such other tax shall be imposed, while any portion of the commodities covered by this contract remain undelivered, the amount thereof shall be paid by the buyer, in addition to the contract prices herein specified;"

"If any such tax, charge or imposition or increase thereof shall be measured per bushel of grain, the amount of the tax to be added to the price of any product produced from such grain shall be computed according to the conversion factor established for such product by the Secretary of Agriculture."

"Any decrease in the processing tax as now or hereafter imposed by the United States shall inure to the benefit of the buyer and be credited against the contract prices named in this contract to the extent—and only to the extent—that the grain used in the manufacture of the product covered by this contract is milled after the decrease in the processing tax takes effect and to the extent that the seller is thereby relieved from the processing tax."

After the contracts of the several plaintiffs were executed in part or in full, the defendant resisted the payment of the tax to the government upon the ground and for the reason, as it was alleged, that the Agricultural Adjustment Act was constitutionally invalid.

On January 6, 1936, the Supreme Court in the Hoosac Mills Case (U. S. v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914) held the act unconstitutional. Pending the court procedure testing said law, the defendant made certain tenders and deposits in court in the nature of a bond for the benefit of the government in the event the validity of the act should be sustained. Such deposits were equal to the amount of the accrued tax, and, upon the decision in the Hoosac Mills Case, such deposits were returned to the defendant.

Predicated upon the facts as above stated, the several plaintiffs believed that they had an interest in the fund thus deposited, and, being denied the right to intervene for the assertion of such interest, they bring this suit wherein, as stated, they ask for an accounting of the tax, which they say was paid by them, or, in other words, that they put the defendant in funds for the payment of the tax.

In the second count of their bill they pray that the amount of the tax computed by the defendant be retained by it, but declared a trust fund for the benefit of the plaintiffs and others holding similar relationships to the defendant.

The defendant has moved to dismiss the bill because of the several grounds of misjoinder of parties and inadequate averments to state a cause of action.

■ 1. It is to be noted in the first place that the tax passed by the defendant on to the plaintiffs was buried in the contract price for the processed commodity. The defendant became subject to and liable for the payment of the tax. The tax was a heavy one under a flexible statute that permitted an increase or a decrease at the discretion of certain officers of the government.

The defendant as a precaution anticipated an increase and specifically provided that in such event, and independently of the contract price, the purchaser should then put the defendant in funds to meet such possible increase. On the other hand, the defendant agreed, because of the other alternative, that, in the event of a decrease in said tax, the several plaintiffs and others in like relationship should have the benefit thereof. Note the language: "Any decrease in the processing tax, as now or hereafter imposed by the United States shall inure to the benefit of the buyer and be credited against the contract prices named in this contract."

This constituted an agreement between the parties as to the procedure to be followed if the tax should be decreased. The decrease was to "be credited against the contract prices named in this contract."

Undoubtedly it was then believed that the decrease might be authorized before the execution of the contract and the payment of the amount due thereon by the plaintiffs. The agreement did not provide for a refund if the contracts had been executed or fully carried out, nor neither did it provide for a credit or refund in the event the tax was held illegal. The payments made by the plaintiffs were entirely voluntary. The plaintiffs were not deceived nor overreached in making the payment; therefore they lost all title and legal interest in the funds thus paid. Shell Oil Co. v. Miller, Inc. (C.C.A.) 53 F.(2d) 74; Wourdack v. Becker, Collector (C.C.A.) 55 F.(2d) 840; Lash's Products Co. v. U. S., 278 U.S. 175, 49 S.Ct. 100, 73 L.Ed. 251.

■ The contracts of the parties specifically provided the procedure for giving the several plaintiffs the benefit of a decrease in the tax. At most, it would become a credit in their favor against the defendant, and clearly would constitute no other relation save that of debtor and creditor. The defendant, therefore, holds no specific funds in which the plaintiffs would have an interest, and under their plain contracts with the defendant they are not entitled to an accounting.

■ 2. The ruling on the first count of the bill and the reasoning thereof applies to the second count. The second count proceeds upon the theory that the identical funds deposited by the defendant as an assurance to the government during the test of the law belonged to the plaintiffs and others in like relationship.

This was not a fact. The moneys paid by the plaintiffs to the defendant was in accordance with a contract price for a commodity. The price was larger because of the tax, and the plaintiffs were apprised of that fact. Provision was made that a decrease in the tax might be made to inure to their benefit. Such benefit was to be granted in a specified way; namely, by being "credited against" the contract prices named in this contract."

■ 3. The question of declaratory judgment was not urged, and clearly, even if so, there is absent such a controversy as to warrant the application of the Declaratory Judgment Act (28 U.S.C.A. § 400).

■ 4. The objection on the ground of a misjoinder of parties is clearly well taken. Each of the plaintiffs had a separate, though a similar, contract, with the defendant. The right of action, if any, is on such contract, and, since the relationship of debtor and creditor at best could only exist, the plaintiffs must stand or fall upon their several separate contracts. It cannot be argued that these plaintiffs have a right to sue in equity in

a case wherein it is sought to avoid a multiplicity of suits, for the reason that such plaintiffs are not menaced with a multiplicity of suits.

 "The multiplicity of suits which confers jurisdiction in equity is a multiplicity of suits to which the complainant will be a party." Thomas v. Council Bluffs Canning Company (C.C.A.) 92 F. 422, 423; Carey v. McMillan (C.C.A.) 289 F. 380.

Moreover, the class suit theory is untenable for the reason that Equity Rule 38 (28 U.S.C.A. following section 723) contemplates that several different persons may have like claims in equity against the same adversary. In the case now being considered the several plaintiffs may have actions at law, but, because they are somewhat similar, equity jurisdiction cannot be invoked merely because the law actions are numerous and of a kindred nature.

The motion to dismiss for the reason stated therein should be sustained. It is so ordered.