[No. 28650. Department One. October 28, 1942.]

J. A. CAMPBELL COMPANY, *Appellant,* v. HOLSUM BAKING COMPANY, *Respondent and Cross-appellant.*[1]

[1]Reported in 130 P. (2d) 333.

*Lewis & Black,* for appellant.

*Lester T. Parker,* for respondent and cross-appellant.

DRIVER, J.—In its amended complaint, plaintiff alleged that, between January 2 and April 14, 1936, it sold to the defendant flour and other bakery supplies, on the purchase price of which there was due and unpaid a balance of $2,472.30 and interest. By its amended answer, defendant denied the material allegations supporting plaintiff's cause of action, and interposed the following affirmative defenses and counterclaims:

First: That plaintiff's action was not commenced within the time limited by law.

Second: That defendant paid the plaintiff processing taxes, in the aggregate amount of $2,472.30, under an act of Congress which was declared unconstitutional and void by the supreme court of the United States; that such taxes had been included in the price of the goods purchased by defendant from plaintiff, but were never paid to the government, and were "legally and justly the money of the defendant"; that, after the processing tax was declared invalid, plaintiff promised to pass on to defendant any refund which the former might receive from the flour millers on taxes paid by the latter, and that plaintiff had received such refund; that, subsequently, defendant paid the United States income taxes and unjust enrichment taxes on the amount of such processing tax refund, and that the plaintiff was estopped to deny that defendant was entitled thereto.

Third: That, on a purchase of goods from plaintiff on October 19, 1933, through oversight and mistake,

defendant was overcharged $281.85 on a processing tax item, and that defendant claimed a set-off in that amount against plaintiff's demand.

As there was a manifest failure of proof of the fourth affirmative defense, and the fifth was abandoned, neither of them will be given further consideration.

The plaintiff replied, denying the affirmative allegations of the amended answer and pleading the three-year statute of limitations as a bar to defendant's third affirmative defense and counterclaim.

The parties thereafter filed a stipulation which contained the provision that

"The plaintiff is entitled to judgment against the defendant as prayed for in the plaintiff's amended complaint herein unless the defendant shall legally establish some one or more of the several affirmative defenses, set-offs, counterclaims or estoppels, pleaded in its amended answer and cross-complaint herein, . . ."

The trial court held, as reflected in its findings of fact and conclusions of law, that the plaintiff was entitled to recover the principal amount of its demand, less two set-offs, one under the second affirmative defense for $1,358.10, the amount of the refund received by plaintiff from the miller for processing taxes on flour purchased by defendant, and the other for the overcharge of $281.85, claimed by defendant in its third affirmative defense. Judgment in favor of the plaintiff for the balance of $832.35 was entered. Plaintiff has appealed, and defendant cross-appealed. For convenience, we shall refer to the plaintiff as the appellant and to the defendant as the respondent throughout the remainder of this opinion.

The facts material to the principal question raised by the original appeal may be summarized as follows:

For many years prior to the commencement of its

action, appellant corporation had been buying flour from the Crown Mills of Portland, Oregon, and reselling it to bakers and other consumers. Respondent company, which operated a bakery at Hoquiam, was one of appellant's customers. On January 6, 1936, the supreme court of the United States, in the case of *United States v. Butler*, 297 U. S. 1, 80 L. Ed. 477, 56 S. Ct. 312, held unconstitutional and void a processing tax, imposed under the Federal agricultural adjustment act, at the rate of $1.38 a barrel on white flour and $0.98 a barrel on whole wheat flour.

On February 13th, the respondent, in making remittance for a shipment of flour which it purchased from appellant on January 2nd, deducted the processing tax of $289.80 from the purchase price. By letter, appellant protested against the deduction, and there followed a series of letters between the parties, ending with one dated April 30th. (This correspondence, which respondent claims constituted a written contract for refund of the tax, will be set out in detail later on in this opinion.) During this exchange of letters, respondent continued to buy flour from appellant, and, in remitting therefor, deducted the amount of the processing taxes on certain purchases of flour which respondent had made from appellant during the year 1935. These tax deductions, including the one of February 13th, totaled the exact principal sum of appellant's demand in the present action.

During the pendency of the litigation to determine the validity of the agricultural adjustment act, the millers generally had withheld from the government the processing taxes imposed thereunder. After the act had been declared unconstitutional, Congress passed the revenue act of June 22, 1936, levying upon the funds thus withheld an unjust enrichment, or wind-

fall, tax of 80%. That act permitted a vendor of commodities subject to processing taxes to pay the invalid taxes back to his vendee and escape the windfall tax, provided (1) the reimbursement actually had been made or credited to the vendee on or before June 1, 1936; or (2) had been made thereafter in the bona fide settlement of a written agreement entered into on or before March 3, 1936. The reimbursed vendee was liable for the windfall tax unless, under one or the other of the two stated conditions, he, in turn, had passed the reimbursement on to his vendee. If any taxpayer could show that he had absorbed a portion of the processing tax, such portion was exempt from the windfall tax.

On February 3, 1937, respondent filed its windfall tax return showing therein processing tax reimbursements which it had received from a number of vendors, including $2,472.30 from appellant. This amount was also reflected as income in respondent's Federal income tax return for the year 1936.

February 28, 1937, appellant received from the Crown Mills, on flour purchased by appellant and resold to respondent, a partial refund of processing taxes, the refund being at the rate of $1.00 a barrel on white flour and $0.71 a barrel on whole wheat flour. Appellant made its windfall tax return on this refund June 15, 1938. Both appellant and respondent paid a windfall tax on their respective returns. Each of them was allowed a certain amount of exemption for absorption of the processing tax.

The questions presented by the original appeal are: First, did the parties enter into a contract for refund to respondent of processing taxes paid back to appellant by the Crown Mills; second, was appellant estopped to deny its liability to refund processing taxes

to respondent; and, third, was the overcharge claim asserted in respondent's third affirmative defense barred by the statute of limitations?

■ In connection with the first of the stated questions, it should be noted that, in the transactions to which it pertains, the processing tax was not separately billed or paid as a separate item by the purchaser either on the purchase of the flour by appellant from the Crown Mills or on resale by appellant to respondent. In every instance, the purchaser paid a composite price, and the processing tax entered into the price only as an unsegregated part of the miller's cost of doing business. This being the case, by the overwhelming weight of authority, the respondent did not have the right to recover the taxes from appellant independent of contract. *Lucas v. Panos,* 190 Wash. 402, 68 P. (2d) 617; *O'Connor-Bills, Inc. v. Washburn Crosby Co.* (D. C. W. D. Mo.), 20 F. Supp. 460; *Golding Bros Co. v. Dumaine* (C. C. A. 1), 93 F. (2d) 162; *Johnson v. Igleheart Bros., Inc.* (C. C. A. 7), 95 F. (2d) 4; *Continental Baking Co. v. Suckow Milling Co.* (C. C. A. 7), 101 F. (2d) 337; *Moundridge Milling Co. v. Cream of Wheat Corp.* (C. C. A. 10), 105 F. (2d) 366 (reversing 24 F. Supp. 998); *Zinsmaster Baking Co. v. Commander Milling Co.,* 200 Minn. 128, 273 N. W. 673; *G. S. Johnson Co. v. N. Sauer Milling Co.,* 148 Kan. 861, 84 P. (2d) 934; *Crete Mills v. Smith Baking Co.,* 136 Neb. 448, 286 N. W. 333.

Was there, then, an enforcible contract to refund the processing taxes in the case at bar? If so, it must have been made in the exchange of letters to which we have previously referred. This rather voluminous but revealing correspondence also has an important bearing on the question of estoppel, and we feel that its material portions should be quoted as follows:

February 14, 1936, appellant to respondent:·

"We wish to thank you for your check that we received yesterday. I note you have made a deduction on this for processing taxes. We are unable to accept this check as payment in full for that particular invoice and consequently will simply credit the amount of the check to your account.

"As you know, we do not pay processing taxes to the government, but have bought all our flour up to January 6th on a cost basis from the mill, which included the processing tax. We have paid this for every barrel of flour that was shipped up to that time and this really puts us in the same position as the bakers.

"I want to assure you if we do recover any processing taxes from the Crown Mills that we will rebate them to you in the same proportion that we receive them. Surely nothing could be fairer than this. It will accomplish no good and simply cause us financial embarrassment to have our customers withhold money for processing tax. With the assurance I have given you that we will return them to you, if and when we receive them, won't you please pay the account in full? I would consider it a personal favor."

February 19th, respondent to appellant:

"In reply to your letter of February 14, regarding the processing tax we deducted from our recent remittance, may we say that at the time we made this remittance we had considered the matter carefully, and after reading your letter still feel·we were justified in this particular instance.

"The only argument you offer as to why we should pay the tax, is because it will cause you financial embarrassment. May we call your attention to the amount of processing taxes we have paid through you during the recent years, and which are also tied up.

.  .  .

"Then also while it may be true you have already remitted the tax to the mill, surely they did not remit it to the government, and we doubt if it was even paid into the fund in dispute. And if they have why should

we be the only one with our money tied up when three of us are involved, and the miller is the one dealing with the government. Would it not be just as fair for us to agree to pay the amount if necessary when the final settlement is arrived at, as it is for you and the miller to agree to rebate us?"

February 20th, appellant to respondent:

"I will have to concede you a victory in our little processing tax debate. Your letter of February 19th, I must admit, sounds more convincing than mine. I will use some of the arguments you have outlined in my correspondence with the mills that I represent.
. . .
"I still want to claim some credit for being willing to put myself on record that our company will pass along all processing taxes we secure in the proportion that we receive them. To date, I have not heard of any mill making this statement or even admitting there was a possibility of it. . . .

"I agree with you that the mill had probably not even paid the tax on this particular car of flour. One thing we do know, if it had been paid, the tax had been put in escrow and the money was later returned. However, there is some justification for the mills all over the country taking the stand of refusing to make definite disposition of these taxes. There is a movement on foot by Congress to confiscate these impounded taxes. It is very certain that the tax money does not belong to the processor as every bit of it was passed on. I am inclined to believe that the mills, after they know definitely what the Congressional policy is to be, will rebate a large portion of this tax money to their customers, if the new policy will permit them to do so. . . ."

April 6th, respondent to appellant:

"In order to protect our interests, we have felt it advisable to deduct the processing taxes paid to the various millers during the period from April 1, 1935 until the tax was declared unconstitutional, from the remittances sent to them in payment of their current accounts. This was done not because we did not trust

the millers to refund us, but because we have information of a confidential nature, although quite reliable, that the windfall tax, if passed will read 'a tax on processors unfairly enriched from refunds of processing taxes.' It is our opinion that if this money is refunded to the parties which absorbed it, prior to the time the windfall tax is passed, that it will be exempt as the processor could not then be called 'unfairly enriched.' However if it is not done immediately, we fear our refund will be practically wiped out.

"In order to settle this we have prepared the enclosed schedule, which shows that we are entitled to refunds of $2,182.50, and that after allowing the $16.00 discount on our last check (which does not appear on your statement), and the $289.80 processing taxes which we previously corresponded about, there is a balance of $164.31 due us. Inasmuch as you are not a processor, we are turning this information over to you, as [and] ask that you have it attended to at once, as we do not feel we should lose this amount of money merely because we have dealt with a jobber instead of direct with the processor."

April 14th, appellant to respondent:

"I have certainly read carefully your letter of April 6 regarding processing tax. Of course, our hands are tied in the matter and we can do nothing on processing taxes unless the mills we represent do something for us. . . .

"We, of course, cannot allow you the processing tax that you have deducted. Technically, we did not pay processing taxes, although we certainly paid them in the price of flour that we paid the mill.

"I assure you we will be very glad to settle with you on your claim for processing taxes in direct proportion to any refunds we secure from the mills. I will assure you further that you are in no danger of losing this money merely because you have dealt with a jobber. I am sure when a policy is announced, all the mill companies will have a uniform program. I feel positive that our mills will put us in position to treat our customers just exactly as they treat their own. In fact, from January 6th we have been willing to do more

than any of the milling companies have done, that is to say, we are willing to promise our customers we will rebate to them, if and when we receive refunds from our principals.

"The mills' defense and all the information available, points to the fact that the government is pretty certain to recover the bulk of this money through some sort of windfall tax. The definite opinion of unbiased observers such as Kiplinger in his news letters, also, seems to be that the government will look no further than the processor for this money. In other words, if the processor had passed on taxes, he would be out of luck, as the government would hold him for the entire amount, regardless of the disposition of it. . . . I am sure that once the tax bill is passed that the processing tax situation will be cleared up in some manner.

"In the meantime, we will have to hold this amount in your account as an unpaid balance in order to protect ourselves. We will be pleased to keep you advised of any further developments."

April 23rd, respondent to appellant:

"We are enclosing herewith our check in the amount of $365.09, which is computed as follows: [Here follows an itemized statement showing further deduction of processing taxes in the amount of $164.31.]

"We have read your letter of April 14, and while you state you can only settle with us when the mills you represent do something for you, you also state that we may be sure that we will not lose merely because we have dealt with a jobber. We are therefore dealing with you the same as we are with the millers with whom we have dealt, and are making the deduction as computed in our letter of earlier date.

"We feel the facts in this matter are very plain. The money was given the millers to be used to pay taxes. These taxes were not paid, and have now been declared unconstitutional, and cannot therefore be now paid. The money is obviously ours therefore, and at present there are no taxes levied against the money, and we must demand that it be returned before any are levied. . . .

"P. S. We would be pleased to supply you with an agreement in writing, if you so desire, that if any taxes are passed, which are both legal and retroactive, and which effect these funds, that we will reimburse you to the extent of the deduction being herein made."

April 29th, appellant to respondent:

"I am obliged to return your check of $365.09 for two reasons: first [it was unsigned] . . . ; second, I do not want to accept or cash this check unless it is with the understanding it is payment on account and does not constitute a complete and final settlement of your account.

"You can readily see why I must have this protection. I certainly would be out of luck if I acknowledged payment of your account in full. Then, at a later date if I found that the Crown Mills as well as all other mills in the country were not making rebates on processing taxes or were making them on a different basis than the deduction made, it would put me in a bad position.

"For that reason, I simply want to protect myself and will not accept any payments made without the understanding that the payment is made on account and any amount withheld is subject to final revision when a definite settlement or statement is made by the flour mills of the United States. I will be glad to receive your check on the basis outlined above and would appreciate it if you would sign it and return it.

. . .

"I am exerting all the pressure I can on the mills I represent and I am acquainted with as I, personally, feel the bakers are entitled to refund all the impounded taxes and I am glad to do anything I can to secure this for them."

April 30th, respondent to appellant:

"We are in receipt of your letter of April 29, and in accordance with your request we are returning herewith the check properly signed. . . .

"Of course we understand your position as to accepting the check in final settlement of our account, but as we stated in our last letter, we will gladly give

you a written agreement that we will reimburse you to the extent of the deduction, if it becomes necessary for the millers to pay the government back the taxes they were refunded.

"We know that this is hard for you as you are not in possession of any of the funds returned, but from your letters, we understand you wish us to treat you the same as we are the millers we have dealt with direct.

"In the meantime may we say that we do not intend for J. A. Campbell Co. to lose so much as a single dollar on us, but that we have just about reached the same position as you say the millers have, which is to say nothing and do nothing."

█ Clearly, the foregoing interchange of letters lacks the basic essential elements of a contract. There was no offer and acceptance, no meeting of the minds, and no manifestation of mutual assent. Respondent believed that it was entitled, as a matter of right, to a refund of the processing taxes (all the letters were written before any of the cases holding the contrary and cited in this opinion had been decided), and, for that reason, deducted them from remittances to all of its flour vendors. Appellant protested, and, in an effort to induce the respondent to change the policy, offered the assurance that any refund received from Crown Mills would be passed on to the respondent.

Considering the correspondence as a whole and in the light of the attendant circumstances, we think there was implicit in appellant's assurance the condition that respondent pay its flour bills in full without any tax deductions. Respondent not only steadfastly refused to do this, but persistently made additional deductions of back taxes from remittances on current flour purchases throughout the course of the correspondence. Furthermore, it repeatedly made the counter proposal that it would agree to reimburse appellant for any windfall taxes which the latter might be required to

pay to the government. Appellant did not accept the counter proposal. Even if we regard appellant's promise to pass on to respondent tax refunds received from the miller as an unconditional one, it did not constitute a binding contract for the reason that it was unsupported by any consideration.

■ Nor do we think that there was anything in the correspondence and the other circumstances, as we have related them, which would operate as an estoppel. Appellant never promised to do more than pass on to respondent the amount of tax refund which appellant received from the miller if and when it was received. Manifestly, respondent was not relying on that representation when it made its windfall tax return, because the return was for the *full amount* of the processing tax and was filed *before* appellant had received the partial refund from the Crown Mills. Moreover, as stated in its letter of April 6th, respondent deducted processing taxes "paid to the various millers . . . from the remittances sent to them in payment of their current account"; and the reason given for such action was not that the millers had promised to refund the processing taxes, but, rather, that the respondent considered it advisable in order to escape payment of a windfall tax which respondent anticipated would be enacted by Congress. It is fairly apparent, we think, that respondent made an early windfall tax return because it considered itself entitled to refund of the processing taxes independent of contract, and had reached the conclusion that, if the deductions it had made before the windfall tax was enacted were reported as accomplished refunds, the money would be "exempt as the processor could not then be called 'unfairly enriched.' "

■ One of the essential elements of estoppel, as to the one asserting it, is that, having the right to do so

under the circumstances of the case, he relied upon the estopping conduct of his adversary, and was thereby induced to act in such a way as to change his position to his detriment. 19 Am. Jur. 641 *et seq.,* § 42; 3 C. J. S. 237, 238; *Knutzen v. Truck Ins. Exchange,* 199 Wash. 1, and cases therein cited on p. 9; 90 P. (2d) 282, 285; *Vernon v. Equitable Life Assurance Society, ante* p. 94, 129 P. (2d) 801.

■■ Passing now to the third question presented by the appeal, was respondent's claim asserted in its third affirmative defense barred by the statute of limitations? The date of the claimed overcharge was October 19, 1933. The present suit was not commenced within three years after that date, and, considered as an independent cause of action, the claim was not therefore brought within the time limited by law. Respondent contends, however, that it was not barred since it was urged as a defense, and the three-year statute had not run at the time the appellant's cause of action accrued.

This contention, we think, is clearly untenable. Respondent's claim was not a defense as it had nothing to do with appellant's right to recover. It was not even a recoupment, which Judge Tolman, in *Nelson Co. v. Goodrich,* 159 Wash. 189, 194, 292 Pac. 406, defined as "the keeping back or stopping something which is otherwise due, because the other party to the contract has violated some duty devolving upon him in the same transaction."

Nor can the claim be considered as an item in an open and current account. The record does not show any transaction between the parties by way of sale or payment or otherwise from November, 1933, until May, 1935. Rem. Rev. Stat., § 166 [P. C. § 8173], provides:

"In an action brought to recover a balance due upon a mutual, open, and current account, where there have

been reciprocal demands between the parties, the cause of action shall be deemed to have accrued from the time of the last item provided in the account on either side; *but whenever a period of more than one year shall have elapsed between any of the series of items or demands they are not to be deemed such an account.*" (Italics ours.)

We think the overcharge claim was what respondent called it in its amended answer, namely, a set-off or counterclaim. In the absence of a statute to the contrary, a demand of a defendant, whether pleaded by way of set-off, counterclaim, or cross-complaint, is regarded as an affirmative action, and, unlike a matter of pure defense, is barred if the applicable statute of limitations has run before the commencement of the plaintiff's suit. 34 Am. Jur. 59, 60, § 65; 1 Bancroft's Code Pleading, 535, § 358; annotation, 16 A. L. R. 326; *Legal Adjustment Bureau v. West Coast Const. Co.,* 162 Wash. 260, 298 Pac. 429.

It is our conclusion that respondent's third affirmative defense was barred by the statute of limitations.

By its cross-appeal, respondent advances only this contention, that appellant's action was barred by the three-year statute of limitations. As stated, the action was for goods sold and delivered between January 2, 1936, and April 14, 1936. On February 4, 1939, the appellant and respondent entered into a written contract which recited that respondent had made deductions, aggregating $2,472.30, for processing taxes in connection with its purchase of goods from appellant; that appellant contemplated bringing suit to avoid the bar of the statute of limitations, but respondent requested that the suit be not brought "at the present time pending further efforts to adjust the disputes existing between said parties"; and that,

"1. The first party [appellant] agrees to refrain from bringing suit against the second party [respond-

ent] to recover the amount of the aforesaid deductions, or any part thereof, with interest thereon, for the time being and until the expiration of ten days after written notice by the first party to the second party of its intention to bring such a suit; but the first party shall have the right to bring such a suit, at its option, at or after the expiration of ten days after the first party shall have given to the second party written notice of its intention to bring such a suit.

"2. The second party covenants and agrees that it will, and hereby does, waive any defense it may have against such a suit by virtue of any statute of limitations, and further covenants and agrees not to plead or assert any statute of limitations as a defense to any such suit; provided, however, that such suit shall be brought, if at all, within three years after the date of this agreement. . . ."

April 25, 1939, appellant gave notice of its intention to bring suit, and, more than ten days thereafter, commenced the present action.

Respondent concedes that, if the contract was valid, the action was timely, but maintains that the contract was of no force and effect, because it was without consideration, and for the further reason that it contained no acknowledgment of any debt or promise to pay on the part of the respondent.

Unless inhibited by some statutory provision, an agreement to waive the statute of limitations, made after the statute has commenced to run but before it has fully run, is valid and binding upon the parties if it is supported by a sufficient consideration and is for a definite period of time. And forbearance to sue is a sufficient consideration. 34 Am. Jur. 320, 321, §§ 407, 408; 1 Wood on Limitations (4th ed.), 405, § 76; 1 Bancroft's Code Practice and Remedies, p. 498, § 310; *Dickson v. Slater Steel Rig Co.,* 138 Okla. 238, 280 Pac. 817; *Hill v. Hesse,* 126 Cal. App. 171, 14 P. (2d) 338, 15 P. (2d) 526.

■ Measured by the principles just stated, the contract under consideration was valid and enforcible if it did not violate some statute.

Respondent calls attention to the following language of Rem. Rev. Stat., § 176 [P. C. § 8183]:

"No acknowledgment or promise shall be sufficient evidence of a new or continuing contract whereby to take the case out of the operation of this chapter, unless the same is contained in some writing signed by the party to be charged thereby; . . ."

and argues that the agreement in the instant case was bad because it contained no acknowledgment or promise to pay. We think that respondent has misconstrued the statute. It is in the nature of a statute of frauds and merely specifies that, where an acknowledgment or promise is advanced as evidence of a new or continuing contract, such evidence shall not be sufficient unless it be in writing and signed by the party to be charged. The statute does not mean that the operation of the statute of limitations cannot be avoided by any new contract unless such contract contains an acknowledgment of, or promise to pay or discharge, the debt or obligation. We are in accord with the following statement which appears in 1 Bancroft's Code Practice and Remedies, p. 498, § 310, *supra:*

"Nor is such an agreement [waiving the statute of limitations] in conflict with a code provision that no acknowledgment or promise is sufficient evidence of a new and continuing contract by which to take the case out of the operation of the statute of limitations unless the same is contained in some writing, signed by the party to be charged therewith, although the creditor does not acknowledge the debt nor promise to pay it."

We conclude that respondent is not entitled to prevail on its cross-appeal.

The cause is remanded, with direction to the superior

court to modify its judgment so as to grant appellant recovery of $2,472.30, with interest thereon at the legal rate, in accordance with the prayer of its amended complaint.

ROBINSON, C. J., MILLARD, and SIMPSON, JJ., concur.

[1]Reported in 130 P. (2d) 341.