NOBLESVILLE MILLING COMPANY *v.* JOHNSON

[No. 17,426. Filed March 5, 1946.]

440

*Fesler, Elam & Fauvre,* of Indianapolis, for appellant.

*Albert Stump,* of Indianapolis, for appellee.

CRUMPACKER, J.—During the year 1935 an act of Congress, commonly known as the Agricultural Adjustment Act, was in full force and effect throughout the land and pursuant to its terms the Secretary of Agriculture fixed a tax on the manufacture or processing of wheat flour. This tax was determined by the application of a conversion formula to each bushel of wheat processed and on that basis the processing tax in effect over the period involved in this controversy was $1.38 per barrel of flour.

For many years the National Millers' Federation, hereinafter called the Federation, has been accustomed to prepare, from time to time, a form of uniform sales contract and to recommend to its constituent members that such contract be used in selling flour to their customers. These forms were printed in blank and the terms thereof were changed as changing laws and bureaucratic regulations, pertaining to the milling busi-

ness, made such changes advisable. In accordance with such practice a form of contract was adopted by the Federation on July 10, 1934, which contained the following clause in reference to taxes:

"TAXES: The price named in this contract includes all taxes as at the date hereof proclaimed by the Secretary of Agriculture by virtue of the authority vested in him by the Agricultural Adjustment Act of the United States. Under said act it is provided that said taxes may be changed from time to time. It is recognized by the parties hereto that there is a growing tendency on the part of the United States and the separate states to tax grain and grain products, containers and other items used in connection with the manufacturing, processing, blending, sale or distribution thereof. It is, therefore, agreed and understood that if, after the date of this contract, the commodities and/or containers, or other items used in connection with the manufacturing, processing, blending, sale or distribution thereof, shall become subject to any increase in taxes or to any new or additional tax or taxes other than those included in the price thereof, (if the seller shall be required by law to collect such increases of additional taxes), then, in that event said increases or additional taxes shall be added to the price hereof; and correspondingly if any tax included in the price hereof shall be decreased or abated, then in that event, said decrease or abatement shall be deducted from the price hereof."

A new form of contract was adopted by the Federation on February 21, 1935, in which the so-called tax clause reads as follows:

"TAXES: The price named in this contract includes the processing taxes as now imposed by the United States on the processing of the commodities used in the manufacture of the products covered by this contract, and the containers therefor, excepting millfeed containers, pursuant to the Agricultural Adjustment Act now in effect, but do not include any increase in such taxes which may become effec-

tive after the date of this contract, or any taxes hereafter imposed on the sale or distribution of the products covered by this contract, or the commodities used in the manufacture thereof, or containers therefor, or any similar tax, charge or imposition hereafter levied or imposed by or pursuant to any state legislation; and if any increase in the processing taxes as now imposed shall become effective, or any other such tax shall be imposed, while any portion of the commodities covered by this contract remain unshipped, the amount thereof shall be paid by the Buyer in addition to the contract prices herein specified, provided that no such increase in the processing tax imposed by the United States on wheat shall be added to the price of feeds for feeding livestock.

"If any such tax, charge or imposition or increase thereof shall be measured per bushel of grain, the amount of the tax to be added to the price of any product produced from such grain shall be computed according to the conversion factor established for such product by the Secretary of Agriculture.

"Any decrease in the processing taxes as now or hereafter imposed by any legislative or administrative branch of the United States shall inure to the benefit of the Buyer, if as and when the benefit of such decrease has been actually realized and secured by the Seller, and shall be credited against the contract prices named in this contract to the extent and only to the extent, that the grain used in the manufacture of the product covered by this contract is milled after the decrease in the processing tax takes effect, and to the extent that the Seller is thereby definitely relieved from the processing tax; provided that no such decrease shall be credited on the prices of feeds for feeding livestock.

"If any such decrease shall be measured per bushel of grain the amount of the tax to be deducted from the price of any product produced from such grain shall be computed according to the conversion factor established for such product by the Secretary of Agriculture."

On six occasions between May 18, 1935, and December 2, 1935, the appellant sold to the appellee, at an agreed price, various quantities of wheat flour aggregating a total of 1085 barrels. Each of said sales was a separate transaction and three of them, for 210 barrels each, were evidenced by the written contracts of the parties on the Federation form of February 21, 1935. There is a dispute as to the remaining three transactions, aggregating 455 barrels, the appellant contending that each was by oral agreement with no mention of a tax refund and the appellee insisting that each was in writing on the Federation Form of July 10, 1934.

The Agricultural Adjustment Act, by virtue of which the appellant paid to an escrow agent for the benefit of the United States a tax of $1.38 per barrel on all flour sold to the appellee as above indicated, was declared unconstitutional by the Supreme Court of the United States on January 6, 1936, *United States* v. *Butler* (1936), 297 U. S. 1, and all of such tax money was refunded to the appellant. Contending that, by the terms of the various contracts under which the flour in controversy was sold, all money so refunded belongs to him, the appellee instituted this suit. The trial court so found and judgment went accordingly.

As we view the record the trial court was confronted with two problems. The first was an issue of fact and involved a determination of whether the sale of the 455 barrels of flour above mentioned was upon oral contracts with no mention of tax refunds, as contended by the appellant, or upon the Federation's written form of July 10, 1934, as the appellee contends. This issue was resolved in favor of the appellee and therein lies the source of the first question presented by this appeal. There were no written contracts covering 455 barrels of the flour in controversy,

duly executed by both parties, introduced in evidence. There was evidence, however, that such contracts had in fact been executed and subsequently destroyed and we think the record shows a sufficient foundation for the introduction of secondary evidence as to the contents thereof. It is the manner in which such secondary evidence was admitted to which the appellant objects and upon which it predicates error. Such evidence consists of the oral testimony of the witness Madge M. Johnson as to the contents of the contracts in question and more particularly concerning the tax clauses alleged to have been contained therein. The witness stated that she had refreshed her recollection concerning said tax clauses and, in response to a question as to what they provided, she said: "I believe I can give part of the contents but not in the words. . . . We were always trying to buy as cheap as we could and the tax stated, if the flour had been shipped when the—if the law was changed before the flour was shipped and the price or tax was either greater or less it should be added or deducted from the price of the flour or purchase price quoted us on our contract."

The following then took place: "Q. If you need to in answering the question you may refer to the paper which refreshed your recollection from the beginning and state what the contents were, if necessary reading it from the paper. Objection: We object to that question for the reason she is reading the paper prepared by Mr. Stump and not by herself to refresh her recollection as to a written contract executed eight or nine years ago. Your Honor can see from the form of the contract it is in small type, very complicated, and the Court will take judicial knowledge that a layman will not recall the wording of that. If she had the original contract she could say it was what she placed in Mr.

Stump's hands and that it was the same as she used in each transaction."

The objection was overruled and the witness then read verbatim, from a paper in her possession, the tax clause that appears in the Federation contract form of July 10, 1934. She later identified two blank forms of printed contracts, adopted by the Federation on February 21, 1935, and July 3, 1935, as being identical with the contracts in dispute in all particulars except as to the tax clauses. Over the objection of the appellant the blank forms so identified were admitted in evidence and in this manner the contents of the disputed contracts, as to all matters essential to a determination of this controversy, was established. Without this evidence, the appellant contends, the record is devoid of proof as to the contract upon which the appellee sues and the court's decision on this phase of the case must fall. We do not so conclude.

The witness subsequently testified as follows: "The form of contract which I handed to Mr. Stump I had obtained from a salesman for International Milling Company. He came in the first week after the processing tax was declared unconstitutional by the Supreme Court. I asked him to see the forms of contract. It was the same form as we had always had. It was from the Millers' National Federation. I know the Federation changed their form on February 21, 1935, *but we were using the form of 1934.* It continued to be used after February 21, 1935." From this testimony we think the court could reasonably draw the factual conclusion that the missing contracts were on the Federation's 1934 form. The purpose in presenting to a court, with entire accuracy, the form and contents of a written contract is to enable such court to construe its legal meaning and effect. This had already been

done for the court in a binding decision by the Supreme Court of Indiana in the case of *Smith* v. *Sparks Milling Co.* (1942), 219 Ind. 576, 39 N. E. (2d) 125, wherein all essential facts are identical with those here involved and wherein the Federation's contract form of July 10, 1934, was fully construed in all its legal phases and the rights of the parties, situated in all respects as are the parties here and seeking the same relief, were fully determined. Having concluded that the contracts under discussion were in writing on the Federation's form of July 10, 1934, the court's duty lay along a charted course from which it could not depart without error. In following that course the court had no need of the contracts themselves or of detail evidence of their contents, as there was no dispute between the parties concerning the quantity of flour involved and it is conceded that a tax of $1.38 per barrel was included in the price the appellee paid therefor and that all such tax money has been refunded to the appellant. *Smith* v. *Sparks Milling Co.*, *supra,* is a ruling precedent to which we are constrained to adhere and we conclude therefore that the decision of the trial court insofar as it is concerned with 455 barrels of the flour in dispute is sustained by sufficient evidence without the objectionable testimony of the witness Johnson and the admission of such testimony and the exhibits she identified, if error, was harmless.

The second problem confronting the trial court was the construction of the three written contracts, covering 630 barrels of flour, which the parties have agreed and stipulated were on the Federation's form of February 21, 1935. The court concluded these contracts gave the appellee the right to recover the disputed tax money and entered judgment accordingly. The appellant charges that the decision is contrary to law. In presenting this question to us the appellant contends that

we are not bound by any ruling precedent in Indiana in construing the Federation's contract form of 1935 and in so doing we should follow the decisions of the federal courts and of our sister states where it is held, without exception, that the tax clause therein contained gives the buyer no right to recover the processing tax included in the price he paid for the flour involved. See *International Milling Co.* v. *Illinois Doughnut & Cake Co.* (1944), 320 Ill. App. 332, 50 N. E. (2d) 851; *O'Connor-Bills Inc.* v. *Washburn Crosby Co.* (1937), 20 F. Supp. 460; *Johnson* v. *Igleheart Bros.* (1938), 95 F. (2d) 4; *Consolidated Flour Mills* v. *PH Orth Co.* (1940), 114 F. (2d) 898; *Johnson* v. *Scott County Milling Co.* (1937), 21 F. Supp. 847; *Golding Bros. Co.* v. *Dumaine* (1937), 93 F. (2d) 162; *Noll Baking & Ice Cream Co.* v. *Sparks Milling Co.* (1940), 304 Ill. App. 624, 26 N. E. (2d) 425.

It is true that neither this nor the Supreme Court has had occasion to construe the Federation's contract form of February 21, 1935, and we agree with the appellant that there are a number of differences between the tax clause contained in that contract and the parallel clause set out in the 1934 form. We further agree that if those differences enter the equation and are essential to a correct solution of the problem, the decisions upon which the appellant relies should be persuasive.

Both contracts provide that the price named therein includes the processing tax in effect at the date thereof and both provide that such price shall go up or down as the tax included therein is increased or decreased. The 1934 form places no limit on the time during which a reduction in the tax will result in a rebate to the purchaser. The 1935 form provides for such rebate only in the event the flour "covered by this contract is milled after the decrease in processing taxes

takes effect." Because of this difference in the two contracts it is possible to assume a set of facts upon which a purchaser would be entitled to a rebate if his contract were on the 1934 form while if it were on that of 1935 he must necessarily fail. As applied to the present case, however, the difference seems unimportant. The Agricultural Adjustment Act was declared unconstitutional by the Supreme Court of the United States and with it fell all taxes theretofore levied under its terms. The decision became effective January 6, 1936, but the taxes involved were completely eliminated as of the date of their levy which was before the flour in controversy was milled.

Our attention is called to the further fact that the 1935 contract provides that any reduction in the tax included in the price shall be credited against such price but contains no provision that any payments already made will be refunded or that any money, under any circumstances, will be repaid to the purchaser. From this the appellant concludes that the tax reduction feature of the contract has no application to a situation where such contract has been fully performed by the delivery of the flour and payment of the purchase price in full. It is true that the contract makes no provision for such a contingency but neither is the same expressly excluded and when we have in mind that the primary purpose of the tax clause is to give the purchaser the benefit of any reduction in the tax included in the price of the flour he is about to buy, we can see no logic or justice in the adoption of a construction that would deny him such benefit in the event of a prompt discharge of his contractual obligations. The contract expressly provides that any reduction in processing taxes shall "inure to the benefit of the buyer if, as and *when* the benefit of such decrease has been

actually realized and secured by the seller." (Our emphasis.) This clause, in our opinion, extends the appellee's right to recover benefits beyond the time the contracts involved were completely performed.

A further comparison of the two contracts discloses that the 1934 form contains the words "abate" and "abatement" in connection with the tax reduction clause while these, or similar words, are omitted from the form of 1935. This difference, the appellant contends, robs *Smith* v. *Sparks Milling Co.*, *supra,* of its force as a ruling precedent in the present action. In the Smith case the meaning of the word "abate" was held broad enough to include the elimination of the entire tax by judicial decree—a contingency which the appellee there contended, as does the appellant here, was wholly outside the contemplation of the parties when they made the contract. While the 1935 contract omits the word "abate" it does provide that any decrease in the processing tax shall inure to the benefit of the purchaser to the extent that the seller has been definitely relieved. It is clear that the primary purpose of this provision is to give the purchaser the benefit of tax reductions even to the extent of the total elimination of the tax itself. It was reasonably foreseeable, we think, that such elimination might result from executive order, legislative enactment or judicial decree, and we cannot say, as a matter of law, that any one of these methods was not contemplated by the parties. We are fortified in this view by the fact that when contracts covering most of the flour in controversy were made the appellant had already brought suit to test the validity of the processing tax. But if there remains any doubt as to the meaning of this provision of the contract it must be resolved in favor of the appellee under the

well known and universally recognized rule that "where a contract is ambiguous it will be construed most strongly against the party preparing it or employing the words concerning which doubt arises." 17 C.J.S. Contracts, § 324; *The Illinois Pipe Line Co. v. Brosius* (1939), 106 Ind. App. 390, 20 N. E. (2d) 195; *Rosenbaum Bros. v. Nowak Milling Corp.* (1944), 222 Ind. 108, 51 N. E. (2d) 623; *Municipal City of South Bend v. Blue Lines, Inc.* (1942), 219 Ind. 462, 38. N. E. (2d) 573.

It is not, however, the provisions of the contracts we have above discussed that have furnished the main arena for contention in the numerous cases cited and relied upon by the appellant. A careful analysis of these decisions leads us to conclude that they turn on the major proposition that the tax involved was levied on the manufacturer and the manufacturer, when he paid it, paid his own tax and not that of the purchaser. The purchaser merely paid the price of the flour. The price he paid was composite and the tax item was buried and absorbed therein and was merely reflected in the total price which the purchaser paid in any event. This doctrine was expressly repudiated in *Smith v. Sparks Milling Co., supra,* and, having concluded that there are no essential differences between the contract there construed and those here involved, we are constrained to regard that decision as controlling.

During the course of the trial the appellant offered competent evidence in support of the third paragraph of its answer which alleged in substance that in recovering the tax money involved in this litigation it had expended money equal to 10 percent of the amount recovered and that it is entitled to have such expense money credited against any sum awarded the appellee on his complaint. This evidence was excluded and upon

such ruling of the court the appellant predicates error. In support of this assignment it is contended that the language of the tax clause in the 1935 contract, if it is applicable to the present situation, clearly indicates an intention of the parties that the appellee should be given the benefit of a net recovery only. The appellee counters with the assertion that the contract provides that he shall benefit to the extent that the appellant is relieved of the tax and since the relief was to the extent of the entire tax he is entitled to recover a like amount. That the equities of the situation cannot be considered because the rights and liabilities of the parties are wholly and exclusively contractual.

We think the case of *Smith* v. *Sparks Milling Co.*, *supra*, has definitely established in this state the rule that there can be no recovery by the purchaser from the miller unless there is a contract which provides for such recovery. To this effect we quote from that decision as follows: "From what we have said above, we think it must follow that whatever rights plaintiff may have must be governed by the terms of the contract and from the contract alone, and not by the application of any equitable principles." We do not understand this to mean, however, that the defendant may not assert a set-off sounding in equity. Sec. 2-1016, Burns' 1933, provides: "A set-off shall be allowed only in actions for money demands upon contract, and must consist of matter arising out of debt, duty or contract, liquidated or not, held by the defendant at the time the suit was commenced, and matured at or before the time it is offered as a set-off." The duty the statute refers to may be of equitable as well as of contractual origin and the defendant may set off in his answer every ground of defense he may have, whether legal or equitable. *Miller* v. *Jackson Twp.* (1912), 178 Ind 503, 99

N. E. 102; *Roy* v. *Moore* (1900), 24 Ind. App. 480, 56 N. E. 937; *Johnson* v. *Sherwood* (1905), 34 Ind. App. 490, 73 N. E. 180.

In our opinion the appellant has rested the third paragraph of his answer wholly upon the broad principles of equity and his rights must be determined within the limits of that jurisdiction. On the facts pleaded it is apparent that if equity is to be done and injustice prevented the appellant should be entitled to set off the expense money to which it was necessarily put in order to recover the fund which the appellee insists, and we have so held, inures to his benefit. We conclude therefore that the court erred in denying the appellant the right to prove the allegations of its third paragraph of answer.

Rule 1-8, 1943 Revision provides: "On a motion for a new trial in an action tried without a jury the court may open the judgment, if one has been entered, take additional testimony, amend findings of fact and conclusions of law, or make new findings and conclusions, and direct the entry of a new judgment." This case is therefore remanded to the trial court with instructions to open the judgment, hear evidence on the issues joined on the third paragraph of the appellant's answer, determine the same in accordance with such evidence and to amend its judgment in harmony with this opinion and such issue so determined.

NOTE.—Reported in 65 N. E. (2d) 250.